## COUNTY OF WORCESTER, OCTOBER TERM 1865, AT WORCESTER.

━━━━━━

PRESENT:

Hon. GEORGE T. BIGELOW, Chief Justice.
Hon. CHARLES A. DEWEY, ⎫
Hon. REUBEN A. CHAPMAN, ⎪
Hon. HORACE GRAY, Jr., ⎬ Justices.
Hon. JAMES D. COLT, ⎭

---

MEMORANDUM. On the eleventh day of September 1865, James D. Colt, Esquire, of Pittsfield, was appointed a Justice of this Court, in place of Mr Justice Metcalf, resigned, and took his seat on the bench on the first day of this term.

---

## Foster Freeland & others vs. George Hastings & others.

This court will not restrain by injunction the collection of a town tax "for contingent expenses," if it appears that the objects for which the money is wanted were stated orally at the meeting at which the vote to raise the money was passed, that no objection to the form of the vote was then made, that the objects for which it was raised were necessary expenditures of the town, that no appropriation of any part of the money to any unlawful purpose is intended, and that for many years the town has been in the habit of passing votes to raise money in that form.

The legislature have power to authorize towns to raise money by taxation for the purpose of refunding sums which have been contributed by individuals into a common fund for the general purpose of filling quotas of troops under calls of the president of the United

States during the recent war; but not for the purpose of refunding sums paid by indi-
viduals for substitutes.

Towns may raise money at a meeting duly called after the annual meeting; and if at the
annual meeting they have voted to raise so much money as to require the assessment of
the full sum allowed by law to be assessed upon polls in any one year, a tax subsequently
voted must be assessed only upon property.

PETITION by ten taxpayers, and more, of Sutton, setting forth
that at the annual meeting of that town held on the 20th of
March 1865, the town, under an article in the warrant, voted for
the support of schools, $2000; roads and bridges, $2500; and
for contingent expenses $9500, making no other or further ap-
propriation thereof; that the objects of raising said sum do not
otherwise appear from the proceedings of the town, and are still
unknown to the petitioners; that in a warrant for another town
meeting held on the 12th of June 1865, the second article was,
" to see if the town will raise by taxation or otherwise such sums
of money as may be necessary to pay and refund any money
which has already been at any time contributed by individuals,
in aid of and for the purpose of filling the quotas of this town,
or furnishing men for the present war, under any requisition,
order or call of the president or of the war department of the
United States during the year 1864, under the provisions of chap-
ter one hundred and fifty-two of the laws of 1865, or act or do
anything relative to the same;" that on that article the town
voted "that we raise the sum of $7000 to pay and refund the
money which has been paid or contributed as specified in article
No. 2 of the warrant;" that thereupon the assessors of the town
assessed upon the polls and estates the aggregate of both of said
grants, amounting to $25,516.28, with overlayings on the same
to the amount of $900.28, making the rate of taxation on estates
two dollars and thirty cents on one hundred dollars; that a war-
rant for the collection of said tax was delivered to George Has-
tings, the treasurer and collector of the town; that the grant of
nine thousand five hundred dollars is illegal and void; that *St.*
1865, *c.* 152, authorizing towns and cities to reimburse money
paid for recruiting purposes,* is unconstitutional; that the grant

---

* Section 1 of this statute is as follows: " Any town or city may raise, by
taxation or otherwise, such sums of money as may be necessary to pay and refund

of $7000 was larger than the aggregate of the sums that had been so paid and applied; and that if said grant was legal it should have been made the basis of a special and separate assessment, so that the polls of the town could be charged with the payment of their due proportion of the same. The prayer was, that the treasurer and other officers of the town might be restrained from collecting or enforcing said tax and grants, and for other relief.

The answer of the treasurer of the town set forth that the grants and appropriations of money made by the town of Sutton for the year 1865 were made in the same manner that the town has been accustomed to make such grants and appropriations for the last thirty years, as appears by the records of said town ; that the appropriation of $2500 for roads and bridges, at the March meeting, was not an appropriation of money, but constitutes the basis of a separate tax, and is payable in labor; that the grant of $9500, under the head of "contingent expenses," was based upon a statement made by the chairman of the selectmen in open town meeting, and in the presence and hearing of the plaintiffs, or some of them, that the said sum was made up of the estimated town expenses for the current fiscal year, exclusive of the two thousand dollars granted for schools, and including $4375 for the repayment of money borrowed by the town to pay the town bounty of one hundred and twenty-five dollars to each one of forty-nine soldiers furnished by the said town to fill its quotas under the calls of the military authorities of the United States, during the year 1864; that the several sums of money making up the aggregate of $9500 were for purposes for which the town could legally raise and appropriate money ; that the said chairman also publicly stated in said town

any money which has already been paid and applied by such city or town, or contributed by individuals, in aid of and for the purpose of filling its quotas, or furnishing men for the present war, under any requisition, order or call of the president or of the war department of the United States, during the year eighteen hundred and sixty-four; *provided,* that all sums raised under this act shall be assessed and paid within three years from its passage."

This statute was repealed by *St.* 1866, *c.* 70.

meeting that the aforesaid sum of $4375 would be required the present year and was absolutely necessary to repay the said bounty money, and that the sum of $3479.34 would be required to pay state aid to the families of soldiers, and that the other expenses of the town would be about the same as last year, which appeared by the report of the selectmen of said year to have been about $4700, making in all a sum much larger than $9500; that, after applying the sum then in the treasury, the balance to be provided for was more than $9500, including the discount on taxes; that at the town meeting held in June, a committee of the town chosen for that purpose reported that the sum of $6711 had been contributed by individuals and applied for the purpose of filling the quotas of the town under the calls of the military authorities of the United States for the year 1864; that this committee had but a very brief period within which to prepare and make their report, and it was stated in open town meeting that there were probably some items of expenses for recruiting purposes not included in the report of the committee, and it was suggested that the sum sufficient to cover such omission should be raised, and the sum of $7000 was voted for the purpose named in article 2d of the warrant; that the sum of $5717.60 was actually contributed by individuals for filling said quotas and paid out for that purpose, as shown by a statement of expenditures annexed, to which sum is to be added the further sum of $1000 for two substitutes, making in the whole the sum of $6717.60; that it was stated in the town meeting of the 12th of June that a discount on said sum of $7000 would be made for the prompt payment of the tax assessed therefor, and that the sum that would be realized from said appropriation would be insufficient to reimburse moneys paid out by individuals for recruiting purposes, as aforesaid; and that the town voted a discount of ten per cent. on all taxes paid on or before the first of September, which discount, being deducted from said sum of $7000, leaves the sum of $6300, which is less, including the $1000 aforesaid, than the amount so contributed by individuals.

The parties agreed that at the March meeting the chairman

of the selectmen stated that about $2500 would be wanted for contingent expenses, naming some of the principal items, but not all of them; that certain expenses were said to be the same as those of last year; that at the meeting in June a person who was not the moderator made the alleged declarations as to additional items of expense for recruiting, and the ten per cent. discount on taxes, but the same were not heard by the petitioners, or some of them; that contributions for recruits were made by those who were and those who were not liable to the drafts; that the two substitutes were procured by individuals to save them from liability to the drafts; and that the grant of March would require a poll tax of two dollars.

The case was reserved by the chief justice upon the bill, answer and the foregoing facts for the determination of the whole court.

*W. Brigham & I. M. Barton,* for the petitioners. The grant of $9500 for contingent expenses was for an object unknown to the law and void. Gen. Sts. *c.* 18, § 10. *Alvord* v. *Collin,* 20 Pick. 418. The grant cannot be aided by proof of oral declarations in town meeting, or of a local custom to misuse language. Gen. Sts. *c.* 3, § 7. *Granger* v. *Parsons,* 2 Pick. 392. The assessment of the general grants of March should not have been confounded with the special grant of $7000 in June; and if either grant is void, the whole assessment must fail. Gen. Sts. *c.* 11, § 29. *Taft* v. *Wood,* 14 Pick. 366. *Stetson* v. *Kempton,* 13 Mass. 272. *Libby* v. *Burnham,* 15 Mass. 144. The *St.* of 1865, *c.* 152, is void, as against common right and natural equity. *Medford* v. *Learned,* 16 Mass. 215. *Society for Propagation of the Gospel* v. *Wheeler,* 2 Gallis. 105. *Dash* v. *Van Kleeck,* 7 Johns. 477. *McCarty* v. *Hoffman,* 23 Penn. State R. 507. Even assuming that these disbursements by individuals can be considered as acts of charity or patriotism, they cannot be reimbursed at the public expense. This act is retrospective in its operation; and violates the provision securing the right of acquiring, possessing and protecting property. Declaration of Rights, art. 1. *Lowell* v. *Oliver,* 8 Allen, 247. *Gray* v. *Coffin,* 9 Cush. 192. *Coffin* v. *Rich,* 45 Maine, 507. *Proprietors of*

*Kennebec Purchase* v. *Laboree*, 2 Greenl. 275. The act also assumes to authorize towns to take private property for private use. Const. of U. S. Amend. 5. Men who have contributed soldiers from their own sons, and sacrificed them, men who themselves have volunteered as soldiers, and the widows of those who have fallen, are now called upon to reimburse those who advanced money for the purpose of shielding themselves; and who, to the great disparagement of the service, hired men of all sorts to serve by the side of our citizens. There is no public consideration in favor of repaying sums thus advanced for this purpose. The sum paid for substitutes should certainly not be reimbursed.

*P. E. Aldrich,* for the respondents.

BIGELOW, C. J. We have given to the questions raised in this case that deliberate and careful consideration which their interest and importance demand. The power to raise and assess taxes, although essential and necessary to the maintenance and support of civil government, is to be exercised with care, and to be kept strictly within the limits imposed by law. It is the clear right of every citizen to insist that no unlawful or unauthorized exaction shall be made upon him under the guise of taxation. If any such illegal encroachment is attempted, he can always invoke the aid of the judicial tribunals for his protection, and prevent his money or other property from being taken and appropriated for a purpose or in a manner not authorized by the constitution and laws. The legislature of this commonwealth have provided a speedy and effectual remedy against the danger of illegal assessments by towns and cities, and the unauthorized expenditure by them of money raised by taxation. Under the provisions of Gen. Sts. *c.* 18, § 79, immediate resort can be had by a suit or petition to this court, sitting in equity, to hear and decide concerning the validity of a proposed tax or the right to. pay money from the treasury of a town, and any violation or abuse of the legal right and power of raising taxes and assessing them on the inhabitants, as well as of expending money belonging to a city or town, can be effectually restrained and prevented by injunction. It is under this provision that the

present proceeding is brought. The petitioners insist on various objections to the validity of the votes passed by the town of Sutton for the purpose of raising money by taxation for the current year, and to the manner in which the proposed tax has been assessed in pursuance of these votes of the town.

The first objection is, that the doings of the town at the annual meeting held on the twentieth day of March last, by which a vote was passed to raise the sum of $9500 " for contingent expenses " were illegal and unauthorized by law. The gist of this objection is, that a town can legally raise money by taxation for certain specified and enumerated objects only, and that it does not appear on the record of the meeting of the town that the large sum proposed by this vote to be raised for contingent expenses was required for any legitimate or authorized purpose, or that it is to be appropriated for any of the objects for which a town is empowered to raise money by taxation. There would be great force in this objection, if the case stood on the vote alone. As a town in raising money acts under a delegated power, strictly defined and limited, it is necessary to the validity of its action that it should be within the limits of its legal capacity. A vote to raise moneys for contingencies only, without qualification or limitation, or any designation of the purpose to which the money is to be appropriated, if it was intended to embrace any considerable portion of the sums raised by a town, would be equivalent to a general vote to raise money. But a town or city has no power or authority to pass such vote. Inasmuch as it can grant money only for certain specified and enumerated objects, unless these are in some way designated in the vote authorizing a tax, or otherwise declared and made known at the time of the grant of money, there would be no means of ascertaining whether a town acted within the limits of the authority granted to it by the legislature in voting the money, and no mode of restraining the agents of the town in its appropriation and expenditure. Every voter in a town has a right to know or to have the means of ascertaining the purposes and objects for which money is proposed to be granted; otherwise he cannot judge of the necessity or propriety of the grant

or intelligently exercise his privilege of voting thereon. **Every** inhabitant who is liable to assessment ought to have access **to** sources of information by which he can ascertain whether he is called on to contribute to objects which can properly be made a municipal charge or burden ; otherwise he might be subjected to unlawful exactions without the means of redress. It is obvious, therefore, that the power of raising money by taxation, delegated to towns, ought to be exercised by making specific grants or appropriations, and not by votes expressed in vague and indefinite terms, which give no indication of the purposes for which the money is to be appropriated and expended.

We do not mean to say that a grant for contingent expenses would in all cases be irregular or objectionable. If limited to small amounts, and designed to cover items of expenditure which could not be enumerated, but which were only incidental to the execution of the main objects of municipal expenditure for which specific grants were made, such a grant could not be deemed to be an unauthorized or excessive exercise of the power to raise money conferred on towns by the legislature. But it would be otherwise if the whole or any considerable part of the annual appropriation of a town should be embraced in a general vote of money for contingencies, unaccompanied by any statement or explanation, either oral or written, of the purposes for which it was to be expended.

The vote of the town of Sutton, at its annual meeting, was in form obnoxious to the objection to its legality urged by the petitioners. But the facts disclosed by the answer, which are not controverted, clearly show that the objection is one of form only, and not of substance. It appears that this grant, though expressed to be for contingencies only, was in fact based upon a statement made by the chairman of the selectmen at the meeting of the town at which the vote was passed, in presence of the petitioners or some of them, setting forth the specific objects for which a principal part of the money proposed to be raised was required, and that the whole sum raised was for the necessary expenditures of the town, and clearly within the scope of the powers granted to towns to raise and appropriate money. It

also appears that this mode of making the annual grants and appropriations of the town has been practised without objection by the inhabitants in their town meetings during the last thirty years, and it does not appear that any objection has ever been made to this method of procedure in previous years, or that any question concerning its legality or regularity was made at the time when the vote appropriating the money was passed in March last, in the presence of some of the petitioners, or at any time since until the commencement of the present proceedings. In this state of facts, we think it very clear that no case is made out for interfering with the collection of the tax in question on the ground that the vote under which it has been assessed was too general and indefinite in its terms. No money has in fact been granted or appropriated under the vote for an illegal purpose ; and the inhabitants of the town knew, or had the means of knowing, the specific objects for which the money was to be expended at the time the appropriation was made. The long acquiescence of the inhabitants of the town in the mode of appropriating money adopted at the meeting in March, in connection with the fact that the petitioners show no injury, either actual or threatened, to their rights by an appropriation of any part of the money thus granted to any unlawful purpose, is decisive against their right to relief against the enforcement of this part of the tax, on the ground of the invalidity of the proceedings in making the grant of $9500.

We are now brought to the consideration of the more serious objections urged by the petitioners to the vote passed at the meeting of the town in June last, by which the sum of $7000 was granted to pay and refund such sums of money as had been previously contributed by individuals in aid of and for the purpose of filling the quota of soldiers allotted to the town, or furnishing men for the existing war under any requisition, order or call of the president or war department of the United States during the year 1864. The fundamental objection urged against the validity of this vote is, that although the town was authorized to raise money for the purpose therein expressed by the provisions of *St.* 1865, *c.* 152, the legislature exceeded their

constitutional authority in passing the statute, and could not lawfully clothe towns with the power to raise money for any such purpose. In considering this grave objection, and the reasons on which it is founded, we assume that certain propositions which have not been called in question at the bar are clear beyond controversy. The first is, that it was competent for the legislature to appropriate money and levy a tax on all the inhabitants of the Commonwealth for the purpose of paying bounties to persons who had volunteered or might volunteer to enlist as soldiers in the armies of the United States raised under orders of, the federal government to aid in suppressing a rebellion against the constituted authorities of the United States. This was settled on full and careful consideration in *Lowell* v. *Oliver,* 8 Allen, 247. It was also there determined that it was not an excess of authority or an unlawful exercise of power by the legislature to raise and appropriate money for the purpose of reimbursing to the several towns of the Commonwealth the amount of such bounties as had been previously advanced and paid by them to persons who had enlisted in the military service of the United States. The payment of money for such a purpose was deemed to be in the nature of a public burden or charge, which the legislature might distribute by taxation among the whole people of the Commonwealth, and it was held to be immaterial whether the tax was assessed in anticipation of such payment, or for the purpose of refunding money to the cities and towns which they had advanced without legislative sanction for the purposes of meeting and performing a pressing public duty or charge for which no adequate provision had been made in anticipation by the legislature.

Another proposition, which seems to us to be equally clear, is, that it is competent for the legislature to impose on towns the burden of performing certain duties of a public nature, which primarily devolve on the state, and for the due execution and fulfilment of which it is incumbent on the legislature to provide. Many of the important institutions of civil governments, and of the rules and regulations on which the welfare and good order of society essentially depend, can be conveniently maintained

and enforced only by a delegation of authority from the law-making power either to individuals or to corporations, municipal or otherwise, who, from their situation or organization, and their peculiar relations to the community, can efficiently carry out and execute in detail a class of duties which the state itself through the immediate officers of the government might find it difficult or impracticable to perform. Familiar instances of such delegation of power are found in the laws providing for and regulating the construction and maintenance of roads and bridges, the support of paupers and the establishment and support of public schools — duties all of which originally and primarily devolve on the Commonwealth, and which it is their province to see are properly and effectually fulfilled. It is certainly true that the burden of performing these and other similar duties does not always bear with perfect equality upon those to whom they are delegated, and who are charged by the legislature with the care and expense of their fulfilment. One town may have a greater extent of roads and bridges to construct and maintain, or a larger number of paupers to support, or of children to educate, than another town of the same size, population and resources. But such inequalities are inseparable from the imperfection of all human institutions. Perfect equality in the allotment of public burdens is unattainable. If they are distributed on just principles, applicable alike to all on whom they are imposed, if no undue discrimination is made among those on whom a charge or duty is laid, if no tax is assessed which is disproportionate or " without the assent of the people or their representatives," substantial equality will be attained, and no legal or constitutional right or privilege will be violated or invaded. We suppose it to be true that originally one of the main objects of a division of a state into counties and towns was, the necessity of having a convenient and permanent system of agencies, by means of which many of the burdens and duties which are incident to and inseparable from the institutions of civilized society and the due execution of wise and wholesome laws could be readily and fairly distributed and performed. From the earliest period of the history of the colonies of Plymouth

and Massachusetts Bay, towns and counties, especially the former, have been charged with the execution of such duties and the costs and charges incident thereto. Among those thus delegated to towns was the duty of raising and organizing soldiers or militia for the common defence, especially in time of war or imminent public danger, and of providing arms and ammunition for their use. Plym. Col. Laws of 1682, (ed. of 1836,) 71, 114, 215, 224, 285. 1 Mass. Col. Rec. 84, 187; 2 Ib. 282; 3 Ib. 32, 256, 26; 4 Ib. 83; 5 Ib. 399, 412. See also Prov. Sts. 5 W. & M. *c.* 7, §§ 10, 21; 16 Geo. III. *c.* 1, §§ 4, 7, 20; *Sts.* 1776, *c.* 21; 1781, *c.* 21.

There would seem to be no good reason for supposing that a power so long exercised without doubt or question operates unequally or oppressively, or in any respect conflicts with the constitutional rights and privileges of the citizen.

If this be so, then it would follow that it was competent for the legislature to confer on towns the power to offer and pay bounties to persons who should enlist in the public military service for the purpose of filling up the calls made on the state by the president of the United States, and completing the quotas assigned to the several towns. The power to authorize towns to raise and appropriate money for such a purpose is necessarily included within the larger power by virtue of which the duty of raising their due proportion of troops may be imposed on the several towns. The legislature were clearly authorized to confer all the necessary and reasonable incidents and means by which towns might be enabled to fulfil the duties which they were required to perform. If an expenditure of money was reasonably necessary and proper to enable towns to fill the quotas of troops allotted to them respectively, it would be competent for the legislature to authorize the appropriation of money for the purpose, or to confirm and make valid the doings of towns in raising money to accomplish the object. This power was distinctly recognized in the recent case of *Fowler* v. *Selectmen, &c. of Danvers*, 8 Allen, 80. The action of the town which was called in question in that case was taken under *St.* 1863, *c.* 38, which not only authorized the raising of money by towns for

the payment of bounties, but also ratified and confirmed the do·ings of towns which had previously raised and appropriated money for that purpose. Although it was there held that the town had exceeded, the authority conferred by the statute, the validity of the statute itself was not only not called in question, but it was assumed both by the counsel and the court. On reconsideration, we see no reason for doubting that this assumption rested on firm and solid foundations.

It may not be immaterial to notice in this connection that there is an early precedent in the legislation of this state which serves to show that the raising of men for military service and the payment of bounties to them by towns were not deemed by a legislature nearly contemporaneous with the foundation of our constitution to be inconsistent with common right, or contrary to the principles on which our government and institutions are founded. By an act passed in 1777, *c.* 41, it was provided that towns at any legal meeting might vote money " for the encouragement of men to engage in the army," to be assessed on the inhabitants of towns according to the rules and methods prescribed by law for apportioning the state tax; and it was further enacted that all grants and assessments which had been voted in times past for such purposes should also be deemed and taken to be legal and valid.

From what has been stated, it would seem to be clear that it would have been competent for the legislature to authorize towns in 1864 to pay bounties to persons who should then enlist in the military service of the United States, or to pass an act subsequently confirming and declaring valid any vote or grant of money previously made by towns for such an object. Nor is this proposition seriously controverted by the learned counsel for the petitioners.

But it is urged on their behalf, and this forms the main ground on which they seek to set aside the tax assessed by the town. that the money which the *St.* of 1865, *c.* 152, authorizes the town to raise by taxation is not to be appropriated as under previous acts to refund moneys paid by towns, acting as public agents in the discharge of a clearly recognized duty which they

were bound to perform on behalf of the Commonwealth, but that under the provisions of the statute the tax in question is imposed for the purpose of repaying to individuals various sums of money which they had previously contributed to a common fund, the object of which was to enable the towns to furnish the quota of troops allotted to it under the act of congress of February 20th 1864, St. of U. S. of 1864, *c.* 13, by the payment of bounties to those who should voluntarily enlist in the service of the United States, instead of supplying the requisite number by resorting to a compulsory draft. It is contended by the petitioners that the effect of such an appropriation of money by the town to be raised by taxation is equivalent to the taking of money from one individual or class of individuals for the purpose of giving it to another individual or class; or, if this view be not correct, that it is an assessment laid on the holders of property, not for a public object or a legitimate purpose of expenditure, but to satisfy claims having no real existence, and which were created by an act of retrospective operation in favor of persons who had no just or equitable right to reimbursement either from the Commonwealth or the town. If this is a correct statement of the provisions of the statute and of the effect of the appropriation of money and the assessment of the tax which it authorizes, it is certainly open to very grave and perhaps insuperable objections. But after careful consideration, bearing in mind the presumption in favor of the validity of the statute which always exists when an act has been passed according to .he forms prescribed by the constitution, we are all of opinion that the objections to its validity are founded on a partial and limited view of the scope and purpose of the act and of the true nature and object of the contribution of money, the reimbursement of which towns are authorized to make under its provisions.

Under the act of Congress of February 24, 1864, St. of U. S. of 1864, *c.* 13, as well as under previous acts, the president of the United States was authorized to call for such number of men for the military service of the United States as he might deem necessary, in view of the public exigencies during th

existence of the war, and, if the quotas of each city or town were not filled within the time designated by the president, a draft of such number of men as were deficient in such quotas was authorized to be made. In view of this authority, and in consequence of calls made by the president, as well as in anticipation of the requisitions for troops to fill the regiments and companies from this state then in the field, the mayors of cities and the selectmen of towns were, by an order of the governor of the Commonwealth, dated May 31st 1864, continued as recruiting officers for the purpose of procuring recruits by voluntary enlistment, as had been done under previous calls made by the authority of the United States. *Tyler* v. *Pomeroy*, 8 Allen, 498.

It was under these enactments, and the calls of the president and the order of the governor which followed them, that the selectmen and inhabitants of the several cities and towns throughout the Commonwealth became engaged in the year 1864 in strenuous efforts to raise the number of troops allotted to each city and town as its quota. One great purpose was to avoid a resort to a draft, and the hardship and inequalities, as well as the social and industrial evils, which might follow, if, in consequence of a failure to procure recruits by voluntary enlistment, it became necessary to select them by lot from those citizens who were enrolled and liable to military duty. Indeed, the policy of the United States, as well as of the Commonwealth, from the beginning of the recent war to its close, seems to have been to procure troops by the enlistment of volunteers rather than by a draft. It was only after the lapse of a period of time to be designated in each call for troops by the president, during which the quota of states could be filled by voluntary enlistment, that he was authorized by congress to supply deficiencies which might be found to exist in the quota of any state by a draft among those who were borne on the enrolment lists. It certainly cannot be doubted that the duty of procuring volunteers to enlist in the armies of the United States, under calls from the president, did not rest on any particular class of individuals in the community. It is true that those who were liable to draft in the event of a deficiency of volunteers had a more immediate

interest in increasing the number of those who should volunta·
rily enter into the service; but no greater or heavier obligation or
duty rested on them to procure volunteers than upon any other
class of individuals. The war being waged by the constituted
authorities in compliance with the will of the majority of the
people, as ascertained and declared according to the forms pre-
scribed in the constitution, the duty of contributing to its support
and of adopting means to supply the requisite number of soldiers
to carry it on to a successful issue become obligatory upon all,
as well those who from age or other causes were not liable to
the personal performance of' military duty, as on those who in a
certain contingency might under the laws of congress be called
upon to do a soldier's duty in the field. Neither the officers of
the state nor the citizens thereof could refuse their aid or with-
hold their support from all legal and constitutional measures
deemed to be necessary by the government of the United States
for the prosecution of the war. Every member of society be-
came bound to bear, according to his position and means, a fair
proportion of the burdens incident to the defence and support
of the government. It was on this ground that it has been
heretofore held by this court that the legislature of the Common-
wealth have the constitutional power to levy a tax on all the
inhabitants of the Commonwealth for the payment of bounties
to soldiers, and the reimbursement of towns which had volunta-
rily advanced such bounties without previous legislative au-
thority. *Lowell* v. *Oliver, ubi supra.*

It would seem to follow as a necessary consequence that not
only was the payment of bounties by the Commonwealth and
by cities and towns for the purpose of procuring volunteers a
proper and legitimate object of expenditure of public money
raised or to be raised by taxation, but also that money con-
tributed voluntarily by individuals to raise a fund for the same
purpose may well have been considered by the legislature as an
advancement of money for a public object. When in the sum-
mer of 1864 it became necessary to furnish a large additional
number of soldiers to the army of the United States by filling
the quotas allotted to the several cities and towns, a public

exigency had arisen for which no adequate provision had been made by the legislature. The alternative was presented to the people of the Commonwealth of procuring volunteers to enlist by the payment of bounties or of submitting to the evils and hardships attendant upon an attempt to recruit the army by a draft. In most if not all of the cities and towns, it was deemed to be wise and expedient and most for the interest of the inhabitants to embrace the former branch of this alternative, and accordingly, as no authority was then vested in towns or cities to raise money by taxation or otherwise for the payment of bounties, resort was had to the method of procuring voluntary contributions to raise a fund in each town for such purpose. But these contributions, though voluntarily made, and without any legal claim on the town or city for reimbursement, or any expectation of legislative sanction, were nevertheless given in aid of the performance of a public duty which devolved on the city or town, and for which it would have been competent for the legislature, in anticipation of the exigency, to authorize money to be raised by taxation or otherwise, on the credit of a town or city. In this view, the question as to the validity of the *St.* of 1865, *c.* 152, resolves itself into this : whether it was competent for the legislature to authorize towns and cities to repay to individuals money which, in the opinion of the legislature, they had advanced in a pressing public exigency to enable a town or city to discharge a duty which was legally devolved upon it, and which it could not have performed without such adventitious aid. Upon the best consideration which we have been able to give to the subject, we can see no legal or constitutional objection to the action of the legislature. We are not called on to determine upon the wisdom or expediency of the act. Confining ourselves to the question whether the legislature have transcended their authority in passing it, we are of opinion that no private right is invaded, and no constitutional barrier overstepped, in giving authority to cities and towns to raise money by taxation to reimburse individuals for contributions made in aid of an object of a public or municipal nature, or, in other words, that as it is competent for the legislature to authorize

the imposition of taxes to raise money to be expended for a public purpose, so it is competent for them to sanction an expenditure already made for a like object, and to give authority for its repayment by means of taxation. If these views are correct, then it follows that the statute under consideration is not obnoxious to the objections to its validity urged by the petitioners. It cannot in any just sense be said that the legislature authorized an assessment by means of which money could be capriciously taken from one individual or class and given to another, or that it sanctioned the appropriation of public money to the payment of claims which had no just or equitable existence. The clear and decisive answer to all such objections is, that the money which the statute authorized towns to repay by means of taxation was raised and contributed for a public object. This seems to us not only to constitute a test by which the validity of the statute is proved, but also a safe limit by which the power of the legislature to authorize taxation for repayments or reimbursements of money advanced without legislative sanction may be restrained. On these grounds it seems to us that the action of the town of Sutton, so far as it authorized the assessment of a tax to repay the sums of money contributed by individuals in the months of May, June and July 1864, and subsequent thereto, towards a fund "in aid of and for the purpose of filling the quota of the town and furnishing men for the war," and the payment of the necessary incidental expenses of procuring volunteers, would have been open to no valid legal objection.

But the vote of the town in June last appropriating money and laying a tax was not limited to these objects. The sum of one thousand dollars beyond the amount necessary for the purposes above named was included in the appropriation. The facts in regard to this additional amount are these. It appears that two persons, inhabitants of the town, who were duly enrolled and liable to military duty, in order to protect themselves from liability to draft, each procured a substitute who was accepted and entered into actual service, and that each of these paid for his substitute the sum of five hundred dollars. It was to reimburse the sums so paid for these substitutes by the

persons who furnished them that the sum of one thousand dollars was added to the appropriation by the vote of the town. It seems to us that to such an appropriation of money to be raised by taxation there are two decisive objections. The first and most obvious one is, that it is not within the authority conferred by the statute. The legislature manifestly contemplated only the repayment of money to those who advanced money towards a common fund which had been used for the general purpose of recruiting the requisite number of troops to fill quotas, and which had been appropriated in discharge of the public duty or burden which devolved on the town. This intention is clearly manifested by the statute, which limits the authority to the raising of money to refund sums which had been " contributed by individuals ; " that is, according to the strict and proper meaning of the language, which individuals had given or paid as part of a common stock. This construction is fortified by the connection in which the language was used. The authority is to refund money which had been paid or applied by towns or contributed by individuals for the objects designated ; clearly intending to embrace within the latter category only such sums advanced by individuals as had been used in the same manner and for the same purposes as money taken from the treasury of the town for the general purpose of obtaining the requisite number of soldiers allotted to the town. It is very clear that money paid by individuals to procure substitutes to relieve themselves from liability to draft does not come within the letter or spirit of the statute as thus interpreted. It was neither contributed to a common fund, nor was it used for the general purpose of filling the quota of the towns or of discharging the municipal duty of enlisting troops for the war.

But the other and more decisive objection to the repayment by the town of money paid for substitutes is, that if the language of the statute would warrant the raising of money for such purpose, the legislature have no power to confer such authority on the town. The right to furnish a substitute is a personal privilege conferred on those who are enrolled and liable to do military duty, by means of which they can obtain exemption

from a personal duty or burden which is imposed on them by law. By an act of congress, St. of U. S. of 1864, *c.* 13, § 4, it is provided that any person enrolled in pursuance of the provisions of law may furnish at any time, previous to a draft, an acceptable substitute, and thereupon he shall be exempt from draft during the time for which such substitute shall have been accepted. Under this provision, by procuring a substitute, a person liable to military duty obtains an exemption not merely from an impending draft or liability under an existing call for troops, but for the entire period of time for which his substitute is enlisted. It is obvious that money paid by an individual to procure a substitute in his stead is not paid primarily or chiefly for a public object, but to purchase a personal exemption from a duty or liability to which he is subject by law. It is not contributed to a common fund in aid of a general duty which rests on all citizens, or for the benefit and relief of all of a certain class of citizens who are liable to the performance of an onerous public duty, but it is paid for a specific object and for the benefit of a single individual. We know of no rule or principle on which a valid authority to raise money by taxation to be appropriated to the repayment of money expended by individuals for such a purpose could be granted by the legislature. A statute conferring such power would be obnoxious to the objection that it authorized the raising of money by taxation for the exclusive benefit of particular individuals ; that it relieved one citizen from the performance of a legal duty at the public expense ; and appropriated money for a private purpose which could only be raised and used for public objects. It is hardly necessary to say that a statute designed to accomplish such purposes would be against common right, and would transcend the authority conferred on the legislature by the constitution.

Two minor objections to the validity of the tax were suggested, which seem to us wholly untenable. The first is, that no part of the sum voted to be raised in June was assessed on polls. But the full sum allowed by law to be raised in any one year by a tax on polls was already included in the previous sum of nine thousand five hundred dollars, which was voted to be

raised at the meeting in March. No further sum could be legally assessed on polls during the current year. The other objection is, that the town had no power to raise money at any meeting after the final adjournment of the annual town meeting which was held in March. No provision of law was cited in support of this objection, and we know of no reason why a town may not at any meeting duly called for the purpose, before the taxes for the year are laid, vote to raise money for a legitimate object, and include it within the amount to be assessed for the current year.

The result of the whole case is, that the vote passed at the meeting in March to raise the sum of nine thousand five hundred dollars was legal and valid, and that an assessment for that sum only, if duly laid on polls and estates, would be open to no objection ; but that the vote passed at the meeting in June, having included a sum which the statute did not authorize the town to raise by taxation, and which the legislature had no power to enable a town to include in an assessment, is illegal and void. It necessarily follows that, as the assessment which was actually laid embraced the illegal as well as the legal portion of the sum voted and appropriated by the town, the whole assessment is invalid, and the injunction heretofore issued to restrain and prevent its collection and enforcement must be made perpetual. The assessors of the town, however, can proceed at once to assess the sum voted at the meeting in March without further action by the town. But no sum can be assessed for the refunding of bounties, unless a new appropriation shall be made for that purpose. As the previous vote passed for this object included also the sum paid for substitutes, it cannot now be known that the town would have made any appropriation whatever, at the meeting in June, if the latter sum had been excluded.                    *Injunction made perpetual.*